**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BLAKE WROBBEL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ATKORE INC.; CANTEX INC.; DIAMOND PLASTICS CORPORATION; IPEX USA LLC; JET STREAM, INC.; J-M MANUFACTURING COMPANY, INC. d/b/a JM EAGLE; NATIONAL PIPE & PLASTICS, INC.; OIL PRICE INFORMATION SERVICE, LLC; OTTER TAIL CORPORATION; PRIME CONDUIT, INC.; SANDERSON PIPE CORPORATION; SOUTHERN PIPE, INC.; and WESTLAKE CORPORATION,<br><br>Defendants. | Case No. 1:24-cv-08012-JCD-SMF<br><br>The Honorable Jeremy C. Daniel<br><br>**JURY TRIAL DEMANDED**<br><br>**<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>** |

## TABLE OF CONTENTS


NATURE OF THE ACTION ....... 1

JURISDICTION AND VENUE ....... 4

THE PARTIES ....... 4

PLAINTIFF ....... 4

DEFENDANTS ....... 5

A. Converter Defendants ....... 5

B. Unnamed Distributor Co-Conspirators ....... 8

FACTUAL BACKGROUND ....... 9

I. UNITED STATES PVC PIPE MARKET ....... 9

II. OPIS PROTOCHEM WIRE PVC & PIPE WEEKLY REPORT ....... 12

DEFENDANTS' WRONGFUL CONDUCT ....... 14

III. THE CONVERTER DEFENDANTS FIXED THE PRICE OF PVC WATER PIPE THROUGH THE OPIS PVC & PIPE WEEKLY REPORT ....... 14

IV. DEFENDANTS FIXED THE PRICE OF PVC ELECTRICAL PIPE THROUGH THE OPIS PVC & PIPE WEEKLY ....... 18

V. THE CONVERTER DEFENDANTS' SYSTEMATIC EXCHANGE OF COMPETITIVELY SENSITIVE INFORMATION THROUGH THE OPIS PVC & PIPE WEEKLY VIOLATES SECTION 1 OF THE SHERMAN ACT ....... 20

VI. THE CONVERTER DEFENDANTS REAP RECORD PROFITS WHILE PVC PIPE CONSUMERS PAY ILLEGALLY INFLATED PRICES ....... 23

VII. THE PVC PIPE MARKET STRUCTURE SUPPORTS THE EXISTENCE OF A CARTEL ....... 28

VIII. SIMILAR WRONGDOING IN RELATED MARKETS SUPPORTS THE PLAUSIBILITY OF DEFENDANTS' CONSPIRACY TO INFLATE THE PRICE OF PVC PIPE ....... 31

CLASS ACTION ALLEGATIONS ....... 34

CAUSES OF ACTION ....... 36

A. Violations of Federal Antitrust Law ....... 36

COUNT 1 ....... 36

COUNT 2 ....... 37

B. Violations of State Antitrust Laws ....... 38

COUNT 3: ALABAMA ....... 40

COUNT 4: ARIZONA ....... 40

COUNT 5: ARKANSAS ....... 40

COUNT 6: CALIFORNIA ....... 41

COUNT 7: COLORADO ..... 41
COUNT 8: CONNECTICUT ..... 42
COUNT 9: DISTRICT OF COLUMBIA ..... 42
COUNT 10: FLORIDA ..... 43
COUNT 11: HAWAII ..... 43
COUNTS 12 & 13: ILLINOIS ..... 44
COUNT 14: IOWA ..... 44
COUNT 15: KANSAS ..... 45
COUNT 16: MAINE ..... 45
COUNT 17: MARYLAND ..... 45
COUNT 18: MICHIGAN ..... 46
COUNT 19: MINNESOTA ..... 46
COUNT 20: MISSISSIPPI ..... 47
COUNT 21: MONTANA ..... 47
COUNT 22: NEBRASKA ..... 48
COUNT 23: NEVADA ..... 48
COUNT 24: NEW HAMPSHIRE ..... 49
COUNT 25: NEW JERSEY ..... 49
COUNT 26: NEW MEXICO ..... 50
COUNT 27: NEW YORK ..... 50
COUNT 28: NORTH CAROLINA ..... 50
COUNT 29: NORTH DAKOTA ..... 51
COUNT 30: OREGON ..... 51
COUNT 31: RHODE ISLAND ..... 52
COUNT 32: SOUTH DAKOTA ..... 52
COUNT 33: TENNESSEE ..... 53
COUNT 34: UTAH ..... 53
COUNT 35: VERMONT ..... 54
COUNT 36: WEST VIRGINIA ..... 54
COUNT 37: WISCONSIN ..... 55
RELIEF REQUESTED ..... 55
DEMAND FOR JURY TRIAL ..... 56

Plaintiff Blake Wrobbel, on behalf of himself and all others similarly situated, files this Complaint against Defendants Atkore Inc., Cantex Inc., Diamond Plastics Corporation, IPEX USA LLC, Jet Stream, Inc., J-M Manufacturing Company, Inc. d/b/a JM Eagle, National Pipe & Plastics, Inc., Otter Tail Corporation, Prime Conduit, Inc., Sanderson Pipe Corporation, Southern Pipe, Inc., Westlake Corporation (the "Converter Defendants"); and Oil Price Information Service, LLC ("OPIS") (collectively, "Defendants"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. Plaintiff's claims arise from Defendants' ongoing anticompetitive scheme to fix, raise, maintain, stabilize, or otherwise manipulate the price of polyvinyl chloride ("PVC") pipe sold and purchased throughout the United States from at least as early as January 1, 2021 to the present (the "Class Period").

2. Raw PVC, or "PVC resin," is one of the most widely used plastics in the world. Due to its versatility and durability, raw PVC is used across a broad range of industrial applications, but it is best known for its use in the construction of pipes. Defendants are the largest manufacturers of finished PVC pipe in the United States, also known as "converters." Major purchasers of PVC pipe include construction companies, electrical contractors, utilities and municipalities, industrial and manufacturing plants, and telecommunications companies. Typically, consumers purchase finished PVC pipe from distributors.

3. PVC is purchased as a raw material in the form of resin or granules from chemical companies and is combined with stabilizing materials to create PVC pipe. Finished PVC pipe has discrete characteristics and uses from other plastic pipes due to its high durability, low flexibility,

fire retardancy, and resistance to chemicals and corrosion. Finished PVC pipe is a commodity product and the largest downstream market for PVC.[1]

4. The two most common uses for PVC pipe are the transportation of water ("PVC Water Pipe") and as insulation for electrical wires ("PVC Electrical Pipe").

5. PVC Water Pipe is used to transport large amounts of either potable water (such as in municipal water systems or indoor plumbing) or wastewater (such as in sewage or drainage). PVC Water Pipe is also used in a variety of other applications including HVAC and irrigation for agriculture.

6. PVC Electrical Pipe (also known as "Conduit Pipe") is used to house and insulate electrical wiring, primarily indoors.

7. Because raw PVC is the primary material used in creating both PVC Water Pipe and PVC Electrical Pipe, the price of both types of finished pipe in a properly functioning market is linked to the price of raw PVC. As such, though the price of PVC pipe may vary by application, finished PVC pipe prices move together.

8. Oil Price Information Service, LLC ("OPIS") is a price reporting agency that distributes a report called the "ProtoChem Wire PVC & Pipe Weekly" ("OPIS PVC & Pipe Weekly") to subscribers. This report provides a summary of the current conditions of the PVC pipe market, gathers and reports information from market participants, and provides a "midpoint" price for finished PVC pipe.[2]

---

[1] PetroChemWire, *PVC & Pipe Weekly*, OPIS (last accessed Sept. 3, 2024), https://www.opisnet.com/wp-content/uploads/2019/01/PCW_PVCPipeWeekly_Reduced.pdf.

[2] PetroChemWire, *11 PVC & Pipe Weekly 36*, OPIS (Sept. 9, 2022), https://www.opisnet.com/wp-content/uploads/2019/01/PCW-PVC-Pipe-Weekly-1.4.2019.pdf.

9. OPIS has established a close-knit, two-way relationship with the players at the heart of the PVC pipe market: (a) OPIS receives from converters and distributors a daily inflow of information, including prices, transactions, and projections, and (b) OPIS provides those converters and distributors with reports that include benchmark prices, which the converters and distributors rely on to set their pricing.[3] Indeed, OPIS is in constant communication with the Converter Defendants, whether through email, phone, instant message, or in person-meetings. With OPIS acting as a go-between, Converter Defendants pushed their relationship as competitors past the boundaries set by the antitrust laws. Since at least January 2021, the Converter Defendants have used OPIS to facilitate an agreement to fix the price of PVC pipe sold in the United States.

10. The Converter Defendants orchestrate and maintain their conspiracy via the OPIS PVC & Pipe Weekly report. Through this intermediary, the Converter Defendants coordinate pricing strategies, share competitively sensitive information, make offers to collude, intimidate market participants who may be tempted to lower prices, and fix prices for finished PVC pipe.

11. Defendants' conduct has resulted in supracompetitive prices and record profits for the Converter Defendants in the U.S. PVC pipe market, which are estimated to eclipse $25 billion in 2024, all to the detriment of Plaintiff and the Classes. Plaintiff, on behalf of himself and all others similarly situated, seeks damages as a result of the unlawful conduct, trebled as provided by law.

---

[3] PetroChemWire, *Our Methodology*, OPIS (last accessed Sept. 3, 2024), https://www.petrochemwire.com/our-methodology/.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under §§4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26). This Court also has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1337(a).

13. Venue is proper in this District pursuant to 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c), (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

14. Defendants, both on their own and acting through their subsidiaries and affiliated entities as agents, purposefully availed themselves of this forum. As alleged below, Defendants and their co-conspirators agreed to fix the prices of PVC pipe sold to consumers located in this District and throughout the United States. The Converter Defendants continue to collect illegal profits from consumers located in this District and throughout the United States due to this agreement.

15. Defendants reside, operate, and transact business in the United States. Thus, Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

## THE PARTIES

### PLAINTIFF

16. Plaintiff Blake Wrobbel is a citizen of Tennessee. Plaintiff Wrobbel purchased finished PVC pipe from retailers in Tennessee during the Class Period, including, but not limited to purchases in May 2022 and July 2023. Plaintiff Wrobbel purchased PVC Water Pipe for his personal use (and not for resale) on his family farm located in Tennessee.

**DEFENDANTS**

17. OPIS is a privately owned Delaware corporation headquartered in Rockville, Maryland. OPIS publishes benchmark prices for a variety of commodities, including chemicals and plastics. In 2018, OPIS acquired PetroChem Wire, a series of daily and weekly reports that covers the entire U.S. petrochemical market, including PVC and PVC pipe. In 2022, News Corp acquired OPIS from S&P Global and IHS Markit and merged it with Dow Jones. OPIS publishes the PetroChem Wire PVC & Pipe Weekly report that provides a summary of benchmark prices and market conditions for industry participants.

**A. Converter Defendants**

18. Defendant Atkore Inc. ("Atkore") is a Delaware corporation headquartered in Harvey, Illinois. Atkore's common stock is listed and traded on the New York Stock Exchange under the trading symbol ATKR. Atkore is the largest manufacturer of PVC Electrical Pipe and one of the largest manufacturers of PVC Water Pipe in the United States. Atkore sells finished PVC pipe to distributors and end-users across the United States.

19. Defendant Cantex Inc. ("Cantex") is a privately held Delaware corporation headquartered in Fort Worth, Texas. Cantex is owned by Mitsubishi Corporation. Cantex controls 15% of the U.S. market for PVC Electrical Pipe. Cantex sells finished PVC pipe to distributors and end-users across the United States.

20. Defendant Diamond Plastics Corporation ("Diamond") is a privately held Delaware corporation headquartered in Grand Island, Nebraska. Diamond is owned by Mitsubishi Corporation. Diamond is a leading U.S. producer of PVC Water Pipe, with at least a 12% share of the U.S. finished PVC pipe market, and sells finished PVC pipe to distributors and end-users across the United States.

21. Defendant IPEX USA LLC ("IPEX") is a privately held Delaware corporation headquartered in Pineville, North Carolina. IPEX is the American subsidiary of IPEX Inc., a Canadian corporation that manufactures plumbing and electrical products. IPEX is one of the largest U.S. producers of both PVC Electrical Pipe and PVC Water Pipe. IPEX sells finished PVC pipe to distributors and end-users across the United States.

22. Defendant Jet Stream, Inc. ("Jet Stream") is a privately held Delaware corporation headquartered in Siloam Springs, Arkansas. Jet Stream is the U.S. division of Austria-based PipeLife Group, one of the world's largest manufacturers of plastic pipe and systems. Jet Stream manufactures PVC Water Pipe for municipal water and sewer, well casing, plumbing, and irrigation. Jet Stream sells finished PVC pipe to distributors and end-users across the United States.

23. Defendant J-M Manufacturing Company, Inc. d/b/a JM Eagle ("JM Eagle") is a privately held California corporation headquartered in Los Angeles, California. JM Eagle is a leading producer of both PVC Electrical Pipe and PVC Water Pipe in the United States, with a 23% share of the U.S. finished PVC pipe market. JM Eagle sells finished PVC pipe to distributors and end-users across the United States.

24. Defendant National Pipe & Plastics, Inc. ("National Pipe") is a privately held Delaware corporation headquartered in Endicott, New York. National Pipe is a leading producer of both PVC Electrical Pipe and PVC Water Pipe in the United States, controlling at least 7% of the U.S. market for finished PVC pipe. National Pipe sells finished PVC pipe to distributors and end-users across the United States.

25. Defendant Otter Tail Corporation ("Otter Tail") is a Minnesota corporation headquartered in Fergus Falls, Minnesota. Otter Tail is known as an electric utility company, but

today 70% of its profits come from its PVC Water Pipe business. Otter Tail operates its U.S. PVC pipe business through two main subsidiaries: Northern Pipe Products and Vinyl Tech. Acting through these subsidiaries, and others, Otter Tail is one of the largest manufacturers of PVC Water Pipe in the United States, with at least 6% share of the finished PVC pipe market, and sells finished PVC pipe to distributors and end-users across the United States.

26. Defendant Prime Conduit, Inc. ("Prime") is a privately held Delaware corporation headquartered in Cleveland, Ohio. Prime is also owned by Mitsubishi Corporation. Prime is a leading manufacturer of PVC Electrical Pipe, with 15% of the U.S. market. Prime sells finished PVC pipe to distributors and end-users across the United States.

27. Defendant Sanderson Pipe Corporation ("Sanderson") is a privately held Delaware corporation headquartered in Clarksville, Tennessee. Sanderson manufactures PVC Water Pipe and sells to distributors and end-users throughout the Midwest and Southeast United States.

28. Defendant Southern Pipe, Inc. ("Southern Pipe") is a privately held North Carolina corporation headquartered in New London, North Carolina. Southern Pipe is a leading U.S. manufacturer of PVC Electrical Pipe and sells finished PVC pipe to distributors and end-users across the United States.

29. Defendant Westlake Corporation ("Westlake") is a Delaware corporation headquartered in Houston, Texas. Westlake's common stock is listed and traded on the New York Stock Exchange under the trading symbol WLK. Westlake is a global manufacturer of chemicals and building products. Westlake is one of the largest manufacturers of PVC Water Pipe in the United States, controlling at least 12% of the finished PVC pipe market, and operates this business through its subsidiary Westlake Pipe & Fittings Company, formerly known as NAPCO Pipe & Fittings. Westlake sells finished PVC pipe to distributors and end-users across the United States.

30. Together, the Converter Defendants control at least 61% of the market for the production of PVC pipe sold in the United States.

**B. Unnamed Distributor Co-Conspirators**

31. Distributor Co-Conspirator Core & Main LP ("Core & Main") is a Delaware corporation headquartered in St. Louis, Missouri. Core & Main's common stock is listed and traded on the New York Stock Exchange under the trading symbol CNM. Core & Main distributes water, wastewater, storm drainage, and fire protection products across the United States. Core & Main is the largest U.S. PVC Water Pipe distributor.

32. Distributor Co-Conspirator Ferguson LLC ("Ferguson") is a privately owned Delaware corporation headquartered in Newport News, Virginia. Ferguson is the largest U.S. distributor of plumbing supplies, waterworks, and fire and fabrication products. With over 1,750 locations across North America, Ferguson is one of the largest distributors of PVC Water Pipe, selling to customers across the United States.

33. Distributor Co-Conspirator Fortiline, Inc., operating as Fortiline Waterworks ("Fortiline"), is a privately held North Carolina corporation headquartered in Concord, North Carolina. Fortiline is owned by Reece Group, an Australian company. Fortiline is a wholesale distributor of underground water, sewer, and storm utility products. Fortiline is one of the largest distributers of PVC Water Pipe in the United States and distributes PVC pipe across the country.

34. Together, Distributor Co-Conspirators control approximately 25% of the market for the distribution of finished PVC pipe in the United States.

35. Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

36. "Defendants," as used herein, refers to and includes each of the named Defendants, predecessors, successors, parents, wholly owned or controlled subsidiaries or affiliates, employees,

officers, or agents. Defendants are also liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

37. Where Plaintiff ascribes an action to Defendants, unless stated otherwise, the action is alleged to have been taken by each Defendant.

38. At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein. The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of U.S. PVC pipe prices.

39. Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## FACTUAL BACKGROUND

### I. UNITED STATES PVC PIPE MARKET

40. PVC is a durable thermoplastic with a wide variety of applications.[4] It is the world's third-largest thermoplastic by volume and is widely used due to its versatility, durability,

---

[4] Bill Bowen, *Chemical Profile: US PVC*, ICIS CHEMICAL BUSINESS (Mar. 23, 2018), https://www.icis.com/subscriber/icb/chemicalprofile?commodityId=10232&regionId=11099#_=_.

flame retardance, ease of processability, and low weight.[5] Raw PVC resin is imbued with various additives and molded to specific sizes to create PVC piping for specific applications.

41. In a competitive market, the price relationship between PVC resin and PVC pipe is closely linked because PVC resin is the primary raw material used in making PVC pipe and forms "~80% of the total cost."[6] While PVC is used in a wide variety of industrial applications, including healthcare, clothing, and food packaging, approximately three quarters of PVC produced is used for construction applications, particularly pipes for water and electrical wiring.[7]

42. PVC pipe is not interchangeable with other pipes, including other thermoplastic pipes like Polyethylene pipe ("PE pipe"), Polypropylene pipe ("PP pipe"), and Polystyrene pipe ("PS pipe"). PE and PP pipes are much more flexible than PVC pipe and not as durable. PS pipe differs from PVC pipe in that PS pipe is more brittle, has a lower temperature resistance, has a lower chemical resistance, and is less durable. However, PS pipe is lightweight and easier to handle than PVC. For that reason, PS pipe is used as an insulator for non-infrastructure projects and in specialty projects such as laboratory drainage.

43. In the United States, PVC pipe is used in approximately 66% of water distribution applications and 75% of sanitary sewer pipe applications.[8] More specifically, PVC pipe accounts for more than 70% of new buried water distribution pipes installed in the United States and more

---

[5] *Comprehensive Guide on Polyvinyl Chloride (PVC)*, OMNEXUS (last accessed Sept. 3, 2024), https://omnexus.specialchem.com/selection-guide/polyvinyl-chloride-pvc-plastic; *United States PVC Pipes Market Share, Size, Analysis, Growth, Trends, Report, Outlook, Forecast (2024-2032)*, EXPERT MARKET RESEARCH (last accessed Sept. 3, 2024), https://www.expertmarketresearch.com/reports/united-states-pvc-pipes-market ("PVC Market Research Report").

[6] Ankit Sharma, *PVC pipe makers set for 35% revenue growth this fiscal: Crisil*, ECONOMIC TIMES: REALTY (Jan. 21, 2022), https://realty.economictimes.indiatimes.com/news/allied-industries/pvc-pipe-makers-set-for-35-revenue-growth-this-fiscal-crisil/89034914.

[7] *Polyvinyl Chloride*, CHEMICALSAFETYFACTS.ORG (Oct. 14, 2022), https://www.chemicalsafetyfacts.org/chemicals/polyvinyl-chloride/.

[8] Johnny De N. Martins, et al., *Applications and market of PVC for piping industry*, SCIELO (Apr. 16, 2009), https://www.scielo.br/j/po/a/NRwcH3CbrZvmpNQgGJgKXVJ/?lang=en.

than 75% of newly installed sanitary sewer systems.[9] Other materials used in piping water include cast iron, ductile iron, concrete pressure pipe, steel, cement, and asbestos.[10] In contrast with those alternatives, for most applications PVC pipe has drastically reduced failure and pumping rates, has a longer life expectancy, has the lowest environmental impact over life cycle phases (production, transport, installation, and use), and requires less energy to manufacture, ship, and install, due to its lower weight.[11]

44. While PVC pipe is typically measured and sold by the foot, the industry also uses "block pricing," a tiered pricing strategy in which manufacturers set different prices for different quantities of product, generally incentivizing bulk purchases with a decreased per-foot cost. Block pricing is frequently relevant in the context of large, municipal water projects. PVC pipe sold for municipal water projects constitute 64% of the finished PVC pipe market, and therefore, these large transactions have a major impact on PVC pipe prices.[12]

45. Converters and distributors sell finished PVC pipe to purchasers in the United States through both long-term and immediate-delivery contracts. Long-term contracts, which typically last several years, can be either fixed or adjustable. In a fixed contract, the price does not change based on market conditions. In an adjustable contract, the price will change based on market conditions and will typically be keyed to a recognized industry index or benchmark.

---

[9] *Water Delivery*, VINYL INSTITUTE (last accessed Sept. 3, 2024), https://www.vinylinfo.org/uses/water-delivery/.

[10] *Comparison of Water Pipe Failure Rates in USA and Canada*, UTAH STATE UNIV. (Apr. 2012), https://www.uni-bell.org/Portals/0/ResourceFile/pipe_failure_type_6-5-13.pdf.

[11] *Id.*; *Hydraulic Analysis: Pumping Costs for PVC and Ductile Iron Pipe*, UNI-BELL PVC PIPE ASS'N (last accessed Aug. 15, 2024), https://www.uni-bell.org/Portals/0/ResourceFile/hydraulic-analysis-pumping-costs-for-pvc-and-ductile-iron-pipe.pdf.

[12] Q2 2024 Westlake Corporation Earnings Presentation, *Focused Approach to Delivering Value and Growth, 2nd Quarter 2024*, Westlake Corporation (Aug. 6 2024), https://investors.westlake.com/events-and-presentations/default.aspx, slide 48.

Immediate delivery contracts are more typically used for small-volume projects or unexpected needs and can be keyed to an index or benchmark. Large buyers often use index-based contracts, whether long or short-term, to manage price volatility. Even a non-index-based contract will still ultimately be at a price determined by the same market conditions captured by a benchmark price, like recent agreements and outstanding bids.

46. Contractors and sub-contractors, like plumbers, oftentimes remain on the hook for PVC pipe increases that happen during the project if they agree to a set price with a client before the project begins.[13]

## II. OPIS PROTOCHEM WIRE PVC & PIPE WEEKLY REPORT

47. OPIS is a commodity pricing service that publishes various industry reports including the OPIS PVC & Pipe Weekly report – the industry source for PVC pipe prices. OPIS promises that the report provides "access to pricing backed by a methodology that reflects today's market conditions" and is "developed with the industry's market-makers."[14] The report requires a paid subscription and, as is suggested by the name, is emailed out to subscribers weekly. All the major PVC pipe converters and distributors subscribe to the report and are asked to contribute to its content.

48. To create the OPIS PVC & Pipe Weekly report, OPIS market assessors follow the PVC market throughout a full week of transactions. They are in constant communication with active marketplace participants, through instant messaging, email, and telephone, to discover done deals, bids, and offers. Additionally, market assessors receive deal sheets from market participants

---

[13] Steve Maugeri, *Plumbers continue to see increase in pipe costs*, SPECTRUM NEWS 1 (Sept. 20, 2022), https://spectrumnews1.com/oh/columbus/news/2022/09/07/pipe-costs-increasing-for-plumbers.

[14] PetroChemWire, *supra* note 1.

that detail their daily market activity. Market assessors' decisions are frequently reviewed by OPIS supervisors throughout the trading day and before publication of the market assessment.

49. The PVC & Price Weekly report is broken down into the three types of PVC pipe: municipal water, plumbing, and electrical conduit. OPIS also publishes PVC pipe prices based on the data and information collected from market participants, including transactions and outstanding offers. The "Midpoint" price is the price used by industry participants as a benchmark in index-based contracts.

**Figure 1**[15]

PVC PIPE PRICES

| Municipal Pipe (Blocks) | Low | High | Midpoint |
|---|---|---|---|
| 9/9/2022 | 440 | 440 | 440.00 |
| 9/2/2022 | 440 | 440 | 440.00 |
| 8/26/2022 | 440 | 440 | 440.00 |
| 8/19/2022 | 440 | 450 | 445.00 |

| Plumbing Pipe (East $/ft) | Low | High | Midpoint |
|---|---|---|---|
| 9/9/2022 | 4.23 | 4.48 | 4.36 |
| 9/2/2022 | 4.23 | 4.48 | 4.36 |
| 8/26/2022 | 4.25 | 4.50 | 4.38 |
| 8/19/2022 | 4.25 | 4.50 | 4.38 |

| Conduit Pipe (East $/100 ft) | Low | High | Midpoint |
|---|---|---|---|
| 9/9/2022 | 665 | 675 | 670.00 |
| 9/2/2022 | 672 | 682 | 677.00 |
| 8/26/2022 | 675 | 685 | 680.00 |
| 8/19/2022 | 675 | 690 | 682.50 |




50. The OPIS PVC & Pipe Weekly report also consists of converter and distributor commentary. As described further below, the commentary section of this report often includes

15 Sept. 9, 2022 PVC & Pipe Weekly, *supra* note 2.

specific forward-pricing intentions and invitations to coordinate pricing. It is the main mode of communication between competitors that has enabled them to fix the price of PVC pipe.

## DEFENDANTS' WRONGFUL CONDUCT

### III. THE CONVERTER DEFENDANTS FIXED THE PRICE OF PVC WATER PIPE THROUGH THE OPIS PVC & PIPE WEEKLY REPORT

51. The Converter Defendants, despite being competitors, entered into an illegal agreement to inflate and fix the price of finished PVC pipe sold in the United States. The OPIS PVC & Pipe Weekly reports during that period provide direct evidence of the agreement and its successful execution.

52. Since at least January 2021, Converter Defendants Diamond, Jet Stream, Otter Tail, Sanderson, and Westlake successfully conspired to raise the price of PVC Water Pipe by coordinating their price increases and collaborating with unnamed Distributor Co-Conspirators. Thanks to a flurry of coordinated acquisitions over the past decade, the PVC pipe market is now extremely consolidated and only a few companies effectively control PVC pipe distribution in the United States. Therefore, when OPIS relays information to and from "distributors," OPIS is likely referring to at least Distributor Co-Conspirators Core & Main, Ferguson, and Fortiline, and possibly additional conspirators.

53. During the same period, Converter Defendants Southern Pipe, as well as Cantex and Prime (both owned by Mitsubishi) successfully conspired to raise the price of PVC Electrical Pipe by coordinating their price increases. Converter Defendants Atkore, IPEX, JM Eagle, and National Pipe are leaders in coordinating the price increases of both PVC Electrical Pipe and PVC Water Pipe.

54. Regardless of whether a Defendant participates in the artificial inflation of PVC Electrical Pipe or PVC Water Pipe prices, or both, finished PVC pipe prices rise and fall together, and Defendants work together to inflate prices across the PVC pipe market.

**Figure 2**[16]




55. OPIS participates in the conspiracy by knowingly providing the platform through which the conspiracy was executed and relaying messages coordinating price increases between the competitor Converter Defendants.

56. On January 22, 2021, the OPIS PVC & Pipe Weekly reported that the Converter Defendants were coordinating a price increase, and OPIS encouraged all conspirators to abide by their agreement:

> While some market participants believed that the market needed to be reset with a new price letter close to the current price level, others said ***there is no reason***

[16] OPIS Blog, *US PVC Producers Seek to Hold onto Gains Amid Construction Slowdown*, OPIS (Feb. 20, 2023), https://www.opisnet.com/blog/us-pvc-producers-seek-to-hold-onto-gains/.

> ***converters can't push prices higher*** without a new price letter. ***The only requirement would be discipline.***[17]

57. In the October 28, 2022 issue of OPIS PVC & Pipe Weekly, the Converter Defendants "g[a]ve ***credit to distributors, as they have been partners in the determination not to let prices slip***" for PVC Water Pipe. OPIS noted that the Converter Defendants' agreement to fix finished PVC pipe prices was successful despite "[t]he steep drop in pipe demand." The Converter Defendants also enforced cartel pricing through OPIS, who relayed that "converters see ***no reason for prices to drop*** rapidly once they do start to retreat, as they have shown ***discipline*** thus far and see no reason why that should change."

58. The November 4, 2022 OPIS PVC & Pipe Weekly report shows that OPIS acted as the Converter Defendants' cartel pricing enforcer:

> Converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, but a phone call or two proved that this was not the case. So far, nobody has blinked . . . converters said they have resigned themselves to the fact that demand will be very low in Nov[ember], Dec[ember], Jan[uary] and Feb[ruary] and that dropping their price won't get them more volume.

59. On January 27, 2023, OPIS reported that Converter Defendants Diamond, National Pipe, Sanderson, and Jet Stream coordinated and issued a price increase for February 1 for PVC Water Pipe, and that Northern Pipe Products (a subsidiary of Defendant Otter Tail) told OPIS that they would "follow whatever the market does." OPIS also reported that distributors were wary that converters were building inventory and would "cut[] prices in an effort to stimulate some demand," like in a competitive and fair market. OPIS assured distributors that the converters "***were confident that they could hold prices firm as long as distributors were on the same page***."

---

[17] Bold and italics been added to the original text for emphasis in this Complaint unless otherwise noted.

60. In February 2023, the OPIS PVC & Pipe Weekly report made clear that the Converter Defendants had coordinated a "unanimous" price increase of PVC Water Pipe against the natural forces of supply and demand. On February 3, 2023, OPIS wrote that "[c]onverters had rallied around a price increase for Feb[ruary] 1 which would push municipal pipe prices up." According to OPIS, "[s]ome competitors had only grudgingly joined the effort, as they felt a price hike was not warranted." The February 10, 2023 report confirmed that "the ***increase announcements had been unanimous***," even though "not all converters were particularly enthusiastic about the idea" because "***demand was still too low to support raising prices***."

61. On February 24, 2023, OPIS reported that the Converter Defendants were working with distributors to keep PVC Water Pipe prices inflated:

> ***Converters spoke about working in concert with large distributors for months to keep pricing from sliding*** below Block 440 to prevent devaluing distributors' inventories. They expressed some concern about whether distributors would return the favor and help keep prices from dropping once their inventories were depleted, or if they would revert to their previous pricing strategies in an effort to secure the lowest possible pipe prices.

62. On June 23, 2023, the OPIS PVC & Pipe Weekly report again confirmed that the Converter Defendants were coordinating with distributors to inflate the price of Water Pipe above the level they would be in a competitive and fair market:

> ***Distributors'*** upper management said they were looking for good prices, but ***were not trying to push the market down***. They said they know that if they demand a really low price, it will quickly spread though the market, which would just lower the value of the inventories they still have. Converters responded that management should tell that to their purchasing people, who are trying to get the lowest possible price every single day. They contended there was a big disconnect between the outlook of management and the actions of their purchasing departments.

63. On March 22, 2024, OPIS reported that Converter Defendants Westlake, National Pipe, Jet Stream, IPEX, Atkore, Diamond, Sanderson, and JM Eagle issued a price increase letter for PVC Water Pipe in concert and that "Northern and Vinyl Tech [both owned by Defendant Otter

Tail] did not issue price increase letters, but said they would be ***raising their prices to the same level***."

64. The OPIS PVC & Pipe Weekly confirmed that throughout June and July of 2024, the Converter Defendants executed a coordinated price increase strategy for PVC Water Pipe. In the June 21, 2024 report, OPIS noted that "***converters acknowledged they will need to try again to raise prices***" for PVC Water Pipe and agreed to "put out price letters with an increase of no more than 10 Blocks [discounted bulk quantity of PVC Water Pipe used for a municipal project] above the current market and all aim for the same implementation date. Then, ***if that increase is successful, do it again***."

65. On July 12, 2024, OPIS reported that the "***consensus***" among the Converter Defendants "was that they need to ***get serious about pushing prices up***" for PVC Water Pipe in the face of rising PVC resin prices. Through OPIS, the Converter Defendants directed their co-conspirators "to return to the tactics they had employed a few years ago of going up by only 5 Blocks at a time but ***doing it repeatedly until their desired price level was achieved***."

66. On July 19, 2024, the Converter Defendants relayed to OPIS that they were ready to increase prices for PVC Water Pipe again, and "were waiting for a market leader to announce a ***price hike for them to follow***."

## IV. DEFENDANTS FIXED THE PRICE OF PVC ELECTRICAL PIPE THROUGH THE OPIS PVC & PIPE WEEKLY

67. On May 26, 2023, OPIS disclosed in the OPIS PVC & Pipe Weekly that the Converter Defendants agreed to fix prices of PVC Electrical Pipe above the level they would have been in a competitive market and that, through the report, the Converter Defendants directed market-leading Defendant Atkore to continue to keep prices inflated, and promised to follow its lead:

> Some market participants viewed the new sheets more as an effort to stem the price erosion that has gripped the market rather than a true effort to push prices higher. With resin prices predicted to drop in May and Jun[e] and demand still moribund, they said ***there doesn't seem to be either a demand pull or a cost push to move prices higher***. On the other hand, some converters believed that as the originator of the new sheets ***Atkore needs to take a hard stand*** next week on new business ***at the higher price levels***.

68. In the February 16, 2024 weekly issue, the Converter Defendants coordinated the timing and levels of a price increase for PVC Electrical Pipe:

> Converters will know by the end of next week if Jan[uary] resin prices will be flat, and if their cost for resin is still predicted to increase by 2 cpp for Feb[ruary]. This may give them the backbone to stop the slide in prices, competitors said, and try to recoup this impending loss of margin. Some converters expect that new price sheets will be issues for Mar[ch]. They said the sheets will need to be issued at a level below that of the Jan[uary] sheets, as those are now too high above current market levels.

69. The next week, on February 23, 2024, Converter Defendants announced through OPIS that all conspirators should continue to offer inflated prices on PVC Electrical Pipe through the next month pursuant to their agreement:

> There was talk in the market this week that the new pipe sheets for Mar[ch] might be coming out next week. But, some converters said, if competitors go out next week and try to lock up a bunch of volume before a Mar[ch] price increase can take effect, they won't be able to raise prices at all. Converters found out this week that their resin costs could possibly rise by a total of 5-6 cpp for Feb[ruary] and Mar[ch] purchases. They concluded that they not only need to stop the slide in their pipe prices, but they must push them higher if they don't want to lose more margin to due to the higher resin prices.

70. On March 15, 2024, according to the OPIS PVC & Pipe Weekly, the Converter Defendants agreed that "***everyone needs to start moving prices up*** on business written from now on, or distributors will continue to buy hand to mouth." Shortly after this clear signal to increase prices was disseminated to the Converter Defendants, the price of PVC Electrical Pipe started to move up, and by April 12, 2024, prices had risen by $0.12/ft according to OPIS.

71. On May 3, 2024, OPIS reported that the Converter Defendants "said the ***price hikes won't work unless everyone is working together to implement them***" and the next week's report, published on May 10, 2024, confirmed that "***[c]onverters hope to push prices higher*** next week, but concede ***it will have to be a unanimous effort*** to have any chance of success."

72. According to OPIS, the Converter Defendants' "unanimous" price increase effort in May 2024 succeeded in driving up prices for PVC Electrical Pipe by $0.10/ft, from $3.70/ft on May 3 to $3.80/ft on May 24.

73. On June 21, 2024, OPIS confirmed in the OPIS PVC & Pipe Weekly that the Converter Defendants were currently in the process of colluding to increase the price at which they sold PVC Electrical Pipe, but their last effort failed due to "a lack of coordination." In the same issue, the Converter Defendants sought to coordinate pricing strategies moving forward, based on their admitted success in the past:

> [C]onverters conceded they need to figure out how to ***push prices higher***. The ***consensus*** this week was for a ***single price increase that would take prices up by about 5% over the current market level***, with another percentage added to account for the discount. Then, ***if that works do it again and again until it stops working. Conduit converters have been successful with this strategy in the past***.

74. The following week, on June 28, 2024, the next issue of OPIS PVC & Pipe Weekly confirmed that Defendant "***converters lost no time in starting a price increase effort***" and detailed how Converter Defendants Atkore, Cantex, Prime, National Pipe, Southern Pipe, and IPEX issued identical price sheets across the United States for PVC Electrical Pipe.

## V. THE CONVERTER DEFENDANTS' SYSTEMATIC EXCHANGE OF COMPETITIVELY SENSITIVE INFORMATION THROUGH THE OPIS PVC & PIPE WEEKLY VIOLATES SECTION 1 OF THE SHERMAN ACT

75. Defendants' information exchange amounts to an unlawful agreement in violation of Section 1 of the Sherman Act and violates the information exchange safety zone promulgated by the Federal Trade Commission ("FTC") and the U.S. Department of Justice ("DOJ").

76. In 1996, the FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care industry on various antitrust issues, including information sharing, which has since been applied to industries outside of healthcare.

77. In 2023, the FTC and DOJ announced that they were withdrawing the 1996 Policy because it was too "formalistic," overly permissive on information sharing, and facilitated tacit coordination among firms, thereby softening competition.[18] Principal Deputy Assistant Attorney General Doha Mekki cited DOJ enforcement actions in the poultry, local advertising, and telecom industries as examples wherein information exchanges in less concentrated markets satisfied the safe harbors but still distorted competition.[19]

78. While the 1996 Policy may have not gone far enough, Defendants' information sharing through the OPIS PVC & Pipe Weekly report meets this low bar, and shows that the Converter Defendants, as the largest producers and distributors in the concentrated market for PVC pipe in the United States, and OPIS as the conspiracy facilitator and cartel enforcer, are in violation of U.S. antitrust laws.

79. Among other things, the 1996 Policy provided an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the safety zone was unlikely to raise antitrust concerns and would be unlikely to be challenged by the agencies.

---

[18] Jeffrey J. Amato, et al., *Searching for Safe Harbor: Navigating Information Exchanges Moving Forward*, WINSTON & STRAWN LLP BLOG (Oct. 27, 2023), https://www.winston.com/en/blogs-and-podcasts/competition-corner/searching-for-safe-harbor-navigating-information-exchanges-moving-forward.

[19] *Id.*

80. To qualify for the safety zone, the information exchange must meet ***all*** of the following requirements:

(i) the information exchange is managed by a third party, like a trade association or government agency;

(ii) the information provided by participants is relatively old (*e.g.*, more than three months old); and

(iii) the information is aggregated to protect the identity of the underlying sources, and enough sources are aggregated to prevent competitors from linking particular data to an individual source.

81. The agencies published this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."[20]

82. Accordingly, the safety zone requirements are a useful test for assessing the legality of the information exchange described in this complaint. The safety zone requirements are clearly not met here, as OPIS publishes new information weekly and identifies specific Converter Defendants as the source of transaction and price information.

[20] Statements of Antitrust Enforcement Policy in Health Care, U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N (Aug. 1996), https://www.justice.gov/atr/statements-antitrust-enforcement-policyin-health-care.

## VI. THE CONVERTER DEFENDANTS REAP RECORD PROFITS WHILE PVC PIPE CONSUMERS PAY ILLEGALLY INFLATED PRICES

83. Market data and economic evidence prove that Defendants' anticompetitive agreement to inflate the price of finished PVC pipe above competitive levels resulted in inflated PVC pipe prices for consumers throughout the Class Period.

84. From January 2021 to mid-2022, PVC pipe prices increased nearly 250%, while PVC resin prices grew only 50% during the same period. Moreover, while resin prices retreated late in 2022, PVC pipe prices remained elevated to this day. As a result, the Converter Defendants have massive profit margins for finished PVC pipe.

85. More specifically, the price for PVC resin, the primary input cost in PVC pipe production, rose from $0.59/lb in January 2021 to $0.89/lb in 2022. By January 2023, PVC resin prices normalized to $0.51/lb and have remained stable since, yet PVC Water Pipe prices remain 4.7 times greater than prices were before the COVID 19 pandemic in 2020.[21]

[21] ManBear, *Pipe Price Fixing Report* (July 26, 2024), https://manbearchicken.substack.com/p/pipe-price-fixing ("ManBear Pipe Price Fixing Report"), at 15.

**Figure 3**[22]




86. Since January 2021, PVC Electrical Pipe prices and the Converter Defendants' margins have remained elevated, with gross margin spreads still greater than four times the 2017-2019 average. The Converter Defendants kept PVC pipe prices high as the U.S. economy recovered from the COVID-19 pandemic in 2021, reaching a high of $3.77 in late 2021. PVC Electrical Pipe prices were still inflated to $1.68 in July 2024, nearly three times higher than pre-COVID levels.[23]

---

22 *Id.* at 14.

23 *Id.* at 15.

**Figure 4**[24]




87. Throughout the Class Period, Defendants reaped massive profits from their illegal, anticompetitive agreement to inflate PVC pipe prices. For example, Converter Defendant Otter Tail reported in its SEC filings that the price at which it sold municipal water PVC pipe was up 198%, while its sales volume was down by 23% from 2019 to 2023. Despite the lower sales, Otter Tail's PVC pipe business line grew from 23% of EBIT in 2019 to 70% in 2023, and its margins for PVC pipe exploded to 61% in 2023 from a 14% average from 2013 to 2019.

24 *Id.*

**Figure 5**[25]




88. Additionally, Converter Defendant Atkore, the largest U.S. converter of PVC Electrical Pipe, reported in its SEC 10-K filings that the price at which it sold electrical conduit PVC pipe was up 86%, while its sales volume was down 9% from 2019 to 2023, cumulatively. The margins for that business line expanded from 17-20% in 2016-2019, to 38% in 2023. On a February 1, 2024, earnings call, Atkore President William Waltz admitted that Atkore was trying to push PVC pipe prices up but explained that it was "harder when the demand isn't there to get

[25] *Id.* at 16.

them to realize, but [Atkore is] still optimistic going forward on these attempt[s] to push the prices in the industry up," noting that Atkore "always aspire[s] to increase our pricing."

**Figure 6**[26]




89. Converter Defendant Westlake, one of the largest PVC pipe producers in the United States, saw margins from its PVC pipe business grow from 13.5% in 2019 to 22.5% in 2023, as the price at which it sold PVC pipe increased 74% over the same period.

---

26 *Id.*

90. On September 20, 2022, Spectrum News Cleveland reported that plumbers, like Neptune Plumbing in Ohio, "continue to see increase in pipe costs." Neptune Plumbing Co-President Mike Wallenstein told Spectrum News that "PVC pipe has gone up about 75%" and he has seen prices go "up and up and up over the past two years." Wallenstein said, "There's been a lot of volatility, a lot of market confusion going on, a lot of triggers of areas that we have never seen occur in my lifetime before."[27]

## VII. THE PVC PIPE MARKET STRUCTURE SUPPORTS THE EXISTENCE OF A CARTEL

91. Features of the PVC pipe market make it susceptible to manipulation.

92. ***First***, the U.S. PVC pipe market is highly concentrated and dominated by the Converter Defendants. On the manufacturing side, the Converter Defendants comprise at least 61% of the PVC pipe market. Additionally, multiple Converter Defendants (Atkore, Mitsubishi (parent company of Prime, Cantex, and Diamond), National Pipe, and JM Eagle) dominate production for both PVC Electrical Pipe and PVC Water Pipe. The Converter Defendants' daily production capacities therefore place them at a significant advantage over competitors and potential entrants into the market.

93. Defendant Atkore's President, William Waltz, explained at Citi's Global Industrial Tech and Mobility Conference in February 2024 that "both industry consolidation" and "our acquisitions" have increased Atkore's margin and pricing power. Specifically, in 2013, "there was at least . . . a dozen PVC [pipe] competitors," but since that time, Atkore "bought those companies up and rolled up the industry or our other competitors."

[27] Maugeri, *supra* note 13.

94. ***Second***, the PVC pipe market has high barriers to entry. The construction of a large manufacturing plant requires a significant investment and time. Additionally, due to the nature of the manufacturing process, new entrants would face difficulties complying with a significant volume of regulation and finding a workforce with sufficient expertise in chemical manufacturing to safely produce PVC pipe.

95. On an April 2023 earnings call, Defendant Otter Tail's President and CEO, Charles McFarlane, confirmed that the industry has not "seen any new competition" because "[t]he cost of entry is pretty significant to build the PVC pipe plant."

96. Additionally, a new entrant would have to develop a distribution network and build relationships with either or both PVC Electrical Pipe and PVC Water Pipe distributors and end users, which are already dominated by the Converter Defendants.

97. As a result of these barriers, the entry of new PVC pipe converters and/or distributors is not likely to occur. Even if a new entrant came into the market, there is no assurance that it would not be acquired by one of the Converter Defendants, many of whom have already grown substantially in the last few years thanks to a rash of consolidations in the PVC pipe industry.

98. ***Third***, PVC pipe is a commodity product. There is a material difference between different types of PVC pipe such that pipes designed for one application are generally not substitutable for pipes designed for a different application (*e.g.*, PVC Electrical Pipe is not used to move water and PVC Water Pipe is not used in electrical work). However, within each application, PVC pipe is viewed by purchasers as fungible (*e.g.*, PVC Electrical Pipe from producer A is equivalent to PVC Electrical Pipe from producer B).

99. ***Fourth,*** the Converter Defendants acted contrary to their own economic self-interest by choosing to coordinate increased prices, in place of reducing pricing in an attempt to gain market share like a rational economic actor would be expected to.

100. ***Fifth***, PVC pipe has no functional substitute for the vast majority of its commercial uses. More specifically, there is no functional substitute for PVC Water Pipe because it has several properties, in addition to size/weight ratio, that other pipes cannot replicate, including:

(a) a lifespan estimated at 100 years or more;

(b) drastically reduced failure rates;

(c) a reduced water pumping rate, thus reducing energy consumption over its prolonged lifespan;

(d) high resistance to changes in temperature; and

(e) an imperviousness to rust and other types of water-based corrosion.

101. Similarly, there is no functional substitute for PVC Electrical Pipe. PVC pipe has several properties apart from size/weight ratio that other pipes cannot replicate, including:

(a) the ability to be easily cut and bent, making installation more efficient;

(b) protection from corrosion;

(c) not inherently conductive to electricity like many metal pipes; and

(d) a lower thermal conductivity, which results in reduced heat transfer.

102. Other thermoplastics such as polyethylene, polypropylene, and polystyrene are also not substitutable because PVC has several properties that those materials cannot replicate, such as improved durability, fire resistance, and insulative capabilities. In the face of an increase in price, purchasers of PVC pipe would not switch to these products.

103. On an August 2023 earnings call, Defendant Otter Tail President and CEO, Charles McFarlane described the inelastic demand for PVC pipe: "[P]rices have continued to stay up and stay stronger" because "the cost of the pipe [] isn't a significant component of the overall projects" and customers "need the pipe to do the projects."

104. ***Seventh***, the Converter Defendants' executives and employees have regular opportunities to meet and collude outside of their participation in the OPIS PVC & Pipe Weekly reports, including through their membership and participation in various trade and industry associations and events, including: the Vinyl Institute; the Plastic Pipe and Fittings Association ("PPFA"); the Uni-Bell PVC Pipe Association ("PVCPA"); and the Chemical Fabrics and Film Association ("CFFA"). Furthermore, Defendant OPIS regularly hosts webinars, conferences, and industry events.[28]

## VIII. SIMILAR WRONGDOING IN RELATED MARKETS SUPPORTS THE PLAUSIBILITY OF DEFENDANTS' CONSPIRACY TO INFLATE THE PRICE OF PVC PIPE

105. In 1999, the European Commission penalized 14 PVC resin producers for price-fixing. The Commission alleged that the companies "took part in regular meetings in order to fix target prices and target quotas, plan concerted initiatives to raise price levels and monitor the operation of the said collusive arrangements." Ultimately, the companies were ordered to refrain from entering into any agreement which may have the same or similar object or effect, "including any exchange of information of the kind normally covered by business secrecy." Additionally, on November 11, 2009, the Commission placed total fines of €173,860,400 on 24 companies for price fixing heat stabilizers and plasticizers used to mold pipe from PVC.

[28] Examples of trade association meetings attended by Defendants are listed in Appendix A to the Complaint.

106. Like the markets for PVC pipe raw materials, markets for finished pipes are also susceptible to price manipulation. In 2012, the FTC alleged manufacturers conspired to raise the prices at which ductile iron pipe fittings ("DIPF") were sold in the United States. DIPF are a "component of pipeline systems transporting drinking and waste water under pressurized conditions in municipal distribution systems and treatment plants." The end users of DIPF are typically municipal and regional water authorities. Like here, the competitors coordinated price increases through a third party, the Ductile Iron Fittings Research Association ("DIFRA"). The DIPF manufacturers submitted reports of their previous month's sales to an accounting firm. The data submissions were then aggregated and distributed to the companies. DIFRA enabled each of the companies "to determine and to monitor its own market share and, indirectly, the output levels of its rivals." The Eleventh Circuit upheld the FTC's liability decision.

107. In 2013, in *In re Cast Iron Soil Pipe and Fittings Antitrust Litigation*, purchasers of cast iron soil pipe ("CISP") initiated lawsuits against three CISP pipe manufacturers and the CISP Institute alleging that they conspired to raise the price of CISP. The purchasers alleged that the manufacturers used their market power to carry out their price-fixing conspiracy through discussions at CISP Institute events. The three manufacturers controlled over 90% of the CISP market. Following their secret discussions, the manufacturers would announce identical price increases. As a result of the manufacturers' anticompetitive conduct, prices for CISP were artificially inflated.

108. In 2016, the FTC alleged that Fortiline, an Unnamed Distributor Co-conspirator that also distributes ductile iron pipe ("DIP"), invited a competitor to fix prices in North Carolina and Virginia in violation of Section 5 of the FTC Act. At the time, Fortiline was the third largest distributor of waterworks infrastructure products in the United States and operated 37 branches in

12 states. The end users of DIP typically are municipalities and water utilities. Fortiline settled with the FTC and was ordered to cease and desist from entering into or attempting to enter into agreements to fix prices or engage in market allocation.

109. In 2017, the French competition authority Directorate General for Competition Policy, Consumer Affairs and Fraud Control fined three PVC-floor-covering manufacturers €302 million for a price-fixing scheme. The agreement between the companies covered numerous aspects of sales policy, including prices. The agreement was carried out through secret meetings between the companies during which they would discuss the minimum prices for products and price increases for all their products.

110. OPIS itself has recently been used to manipulate prices. In 2020, the California Attorney General brought a lawsuit against two energy companies for using OPIS to drive up gas prices. Typically, gasoline market participants buy and sell gasoline for delivery on "spot markets." Because spot market trades in California were non-public transactions, market participants relied on price reporting services, such as OPIS. OPIS published a daily West Coast Spot Market Report, which was the industry pricing benchmark used by buyers and sellers of gasoline in California. OPIS used trades that were voluntarily reported by market participants to calculate its daily spot price. The California AG alleged that the two energy companies participated in a scheme to raise the price of finished gasoline via OPIS. The purpose of the scheme was "to drive up or stabilize the OPIS-reported price during pricing windows and to realize supra-competitive profits." Ultimately, the two energy companies settled with the AG for $50 million.

## CLASS ACTION ALLEGATIONS

111. Plaintiff brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, as representative of a class of indirect purchasers seeking injunctive relief ("Nationwide Injunctive Relief Class") defined as:

> All persons or entities in the United States and its territories who purchased PVC pipe from at least as early as January 1, 2021 and until Defendants' unlawful conduct and its anticompetitive effects cease to persist.
>
> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

112. Plaintiff also brings this action on behalf of himself and all other similarly situated as a class action under Federal Rules of Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf the following Class ("State Law Class"):

> All persons or entities who purchased PVC pipe in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin between January 1, 2021 and until Defendants' unlawful conduct and its anticompetitive effects cease to persist.
>
> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

113. Plaintiff believes that there are thousands of Class Members, making the Classes so numerous and geographically dispersed that joinder of all Class Members is impracticable.

114. There are questions of law and fact common to the Classes that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a) whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the price of PVC pipe in violation of the Sherman Act;

(b) the identity of the participants in the conspiracy;

(c) the duration of the conspiracy;

(d) the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e) whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Classes; and

(f) the appropriate measure of damages sustained by Plaintiff and the Classes.

115. Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and Class Members sustained damages arising out of Defendants' common course of conduct in violation of the law as described in this Complaint. The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct.

116. Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff is an adequate representative of the Classes and has no interests adverse to the interests of absent Class Members. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

117. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications.

118. The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

119. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation would entail. The Classes are readily definable and is one for which records should exist in the files of Defendants, Class Members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate the claims alleged herein. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### A. Violations of Federal Antitrust Law

#### COUNT 1
#### PRICE-FIXING IN VIOLATION OF 15 U.S.C. §1
#### CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

120. Plaintiff incorporates the preceding paragraphs by reference.

121. Defendants entered into, and engaged in, a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §§1, *et seq.* ("Sherman Act").

122. During the Class Period, Defendants entered into an agreement to reduce competition by fixing and manipulating the prices of PVC pipe sold in the United States.

123. This conspiracy to manipulate PVC pipe prices caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive PVC pipe prices reflecting true market fundamentals during and following Defendants' unlawful conduct, and thus, Plaintiff and the Class received less in value than they would have received absent Defendants' wrongful conduct.

124. The conspiracy is a *per se* violation of §1 of the Sherman Act. Alternatively, the conspiracy caused substantial anticompetitive effects in the U.S. PVC pipe market. There is no legitimate business justification for, nor pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of their illegal conduct.

125. As a direct and proximate result of Defendants' violation of §1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period and continue to be injured.

126. Plaintiff and members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT 2**
**INFORMATION EXCHANGE IN VIOLATION OF 15 U.S.C. §1**
**CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE**

127. Plaintiff incorporates the preceding paragraphs by reference.

128. Defendants entered into, and engaged in, a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of §1 of the Sherman Act.

129. During the Class Period, Defendants entered into an agreement to reduce competition in the U.S. PVC pipe market by exchanging competitively sensitive information, causing anticompetitive effects without sufficient procompetitive justifications.

130. This conspiracy to reduce competition through an information exchange caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive PVC pipe prices reflecting true market fundamentals during and following Defendants' unlawful conduct, and thus, Plaintiff and the Class received less in value than they would have received absent Defendants' wrongful conduct.

131. This information exchange has been undertaken in furtherance of a price-fixing agreement, which is unlawful *per se*. There is no legitimate business justification for, nor pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of their illegal conduct.

132. As a direct and proximate result of Defendants' violation of §1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period and continue to be injured.

133. Plaintiff and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**B. Violations of State Antitrust Laws**

134. Plaintiff repeats and reiterates the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

135. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, increase, stabilize, or maintain at artificially high levels, the price of PVC pipe in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

136. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, increase, maintain, or stabilize PVC pipe prices production at artificially high levels, which injured Plaintiff and members of the Classes; the exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves

in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

137. Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize PVC pipe prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Classes were deprived of free and open competition and paid more to purchase PVC pipe than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

138. In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiff and members of the Classes.

139. Accordingly, Plaintiff and members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

140. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

141. In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

**COUNT 3: ALABAMA**
**(On Behalf of Class Members that Purchased PVC Pipe in Alabama)**

142. Due to Defendants' unlawful conduct, (1) competition for PVC pipe was restrained, suppressed, and eliminated within Alabama; (2) PVC pipe prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq*. Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiff and members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq*.

**COUNT 4: ARIZONA**
**(On Behalf of Class Members that Purchased PVC Pipe in Arizona)**

143. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout Arizona; (2) price of PVC pipe in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

144. Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq*.

**COUNT 5: ARKANSAS**
**(On Behalf of Class Members that Purchased PVC Pipe in Arkansas)**

145. Defendants' conspiracy unlawfully misleads consumers into believing the price of PVC pipe sold in Arkansas was the result of a free market and Defendants' conduct is substantively unconscionable because it unfairly benefits Defendants at the expense of Plaintiff. ARK. CODE ANN. §4-88-107. Accordingly, Plaintiff and members of the Class seek all available relief under

ARK. CODE ANN. §4-88-101, *et seq.*, resulting from Defendants' deceptive and unconscionable trade practices.

**COUNT 6: CALIFORNIA**
**(On Behalf of Class Members that Purchased PVC Pipe in California)**

146. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout California; (2) PVC pipe prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

147. Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce. Each Defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, inflate, stabilize, and maintain PVC pipe prices. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, inflate, maintain, and stabilize the price of PVC pipe. Accordingly, Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

**COUNT 7: COLORADO**
**(On Behalf of Class Members that Purchased PVC Pipe in Colorado)**

148. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout Colorado; (2) PVC pipe prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3)

individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

149. Defendants have violated COLO. REV. STAT. §6-4-101 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under violated Colo. Rev. Stat. §6-4-101, *et seq*.

**COUNT 8: CONNECTICUT**
**(On Behalf of Class Members that Purchased PVC Pipe in Connecticut)**

150. Defendants have entered into an unlawful agreement in restraint of trade in violation of CONN. GEN. STAT. §35-24 *et seq*. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout Connecticut, and (2) PVC pipe prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of CONN. GEN. STAT. §35-24 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under CONN. GEN. STAT. §35-24 *et seq*.

**COUNT 9: DISTRICT OF COLUMBIA**
**(On Behalf of Class Members that Purchased PVC Pipe in District of Columbia)**

151. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the District of Columbia; (2) PVC pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) members of the Class, including those who resided in the District of Columbia and purchased PVC pipe in the District of Columbia, paid supracompetitive, artificially inflated prices for PVC pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

152. Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq*.

**COUNT 10: FLORIDA**
**(On Behalf of Class Members that Purchased PVC Pipe in Florida)**

153. Through Defendants' actions and the actions of their co-conspirators, PVC pipe prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, competition in the PVC pipe market was restrained, suppressed, and eliminated throughout Florida. Plaintiff and members of the Class, including those who purchased PVC pipe in the State of Florida, paid supracompetitive, artificially inflated prices for PVC pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

154. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. §501.201 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

**COUNT 11: HAWAII**
**(On Behalf of Class Members that Purchased PVC Pipe in Hawaii)**

155. Through Defendants' actions and the actions of their co-conspirators, PVC pipe prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and the Class. *See* HAW. REV. STAT. §§480-4, 480-13. Throughout the Class Period, price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiff and members of the Class, including those who resided in the State of Hawaii and purchased PVC pipe in Hawaii, paid supracompetitive, artificially inflated prices for PVC pipe. During the Class Period, Defendants' illegal conduct substantially

affected commerce in Hawaii. Accordingly, Plaintiff and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq*.

**COUNTS 12 & 13: ILLINOIS**
**(On Behalf of Class Members that Purchased PVC Pipe in Illinois)**

156. Defendants' conspiracy had the following effects: (1) price competition in the PVC pipe market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) PVC pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

157. Defendants have entered into agreements in restraint of trade in violation of 740 ILL. COMP. STAT. /1 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under 740 ILL. COMP. STAT. 10/1 *et seq*.

158. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILL. COMP. STAT. 505/1 *et seq*., and 720 ILL. COMP. STAT. 295/1A, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

**COUNT 14: IOWA**
**(On Behalf of Class Members that Purchased PVC Pipe in Iowa)**

159. Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq*. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) PVC pipe prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under IOWA CODE §553.1 *et seq*.

**COUNT 15: KANSAS**
**(On Behalf of Class Members that Purchased PVC Pipe in Kansas)**

160. Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq*. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Kansas; (2) PVC pipe prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq*.

**COUNT 16: MAINE**
**(On Behalf of Class Members that Purchased PVC Pipe in Maine)**

161. Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Maine; and (2) PVC pipe prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Class seek all relief available under ME. STAT. TIT. 10, §1104.

**COUNT 17: MARYLAND**
**(On Behalf of Class Members that Purchased PVC Pipe in Maryland)**

162. Defendants' conspiracy detrimentally affected the price competition in the State of Maryland for PVC pipe by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized the price of PVC pipe sold

in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

163. Defendants violated the MD. CODE ANN., COM. LAW §11-201 *et seq*., by entering into unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiff and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq*.

**COUNT 18: MICHIGAN**
**(On Behalf of Class Members that Purchased PVC Pipe in Michigan)**

164. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) PVC pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

165. Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771 *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq*.

**COUNT 19: MINNESOTA**
**(On Behalf of Class Members that Purchased PVC Pipe in Minnesota)**

166. Through Defendants' actions and the actions of their co-conspirators, PVC prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for PVC pipe was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiff and members of the Class, including those who resided in the State of Minnesota and purchased PVC pipe there, paid supracompetitive, artificially inflated prices for PVC pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

167. Defendants have violated the MINN. STAT. §325D.49 *et seq*., through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq*.

**COUNT 20: MISSISSIPPI**
**(On Behalf of Class Members that Purchased PVC Pipe in Mississippi)**

168. Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq*. *See* MISS. CODE ANN. §75-57-63. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) PVC pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce. Accordingly, Plaintiff and members of the Class seek all relief available under MISS. CODE ANN. §75-21-1 *et seq*., and MISS. CODE ANN. §75-57-63.

**COUNT 21: MONTANA**
**(On Behalf of Class Members that Purchased PVC Pipe in Nebraska)**

169. By reason of the conduct alleged herein, Defendants have violated MONT. CODE, §§30-14-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) PVC pipe price competition was restrained, suppressed, and eliminated throughout Montana; (2) PVC pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for PVC pipe.

170. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff were injured and are threatened with further injury. Accordingly, Plaintiff and

members of the Class seek all relief available under the Montana Consumer Protection Act of 1973, MONT. CODE, §§30-14-101, *et seq*.

**COUNT 22: NEBRASKA**
**(On Behalf of Class Members that Purchased PVC Pipe in Nebraska)**

171. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) PVC pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

172. Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq*.

**COUNT 23: NEVADA**
**(On Behalf of Class Members that Purchased PVC Pipe in Nevada)**

173. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Nevada; (2) PVC prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

174. Defendants violated the NEV. REV. STAT. ANN. §598A.210 *et seq*., by entering into unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq*. Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to NEV. REV. STAT. ANN. §598A.210.

**COUNT 24: NEW HAMPSHIRE**
**(On Behalf of Class Members that Purchased PVC Pipe in New Hampshire)**

175. Defendants' conspiracy detrimentally affected price competition for PVC pipe purchased in the State of New Hampshire PVC pipe market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC pipe prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

176. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

**COUNT 25: NEW JERSEY**
**(On Behalf of Class Members that Purchased PVC Pipe in New Jersey)**

177. Defendants' conspiracy detrimentally affected the price competition for PVC pipe purchased in the State of New Jersey by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC pipe prices in the State of New Jersey at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Jersey commerce.

178. Defendants engaged in a conspiracy in restraint of the trading of PVC pipe in violation of the New Jersey Antitrust Act. N.J. STAT. ANN. §56:9-3. Accordingly, Plaintiff and members of the Class seek equitable relief and compensatory damages, together with reasonable attorneys' fees, filing fees and reasonable costs of suit, including but not limited to expenses of discovery and document reproduction. N.J. STAT. ANN. §56:9-12.

**COUNT 26: NEW MEXICO**
**(On Behalf of Class Members that Purchased PVC Pipe in New Mexico)**

179. Defendants' conspiracy detrimentally affected the price competition for PVC pipe purchased in the State of New Mexico by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC pipe prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

180. Defendants violated the N.M. STAT. ANN. §57-1-1 *et seq.*, by entering into unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiff and Members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

**COUNT 27: NEW YORK**
**(On Behalf of Class Members that Purchased PVC Pipe in New York)**

181. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.* Defendants' conspiracy had the following effects: (1) price competition in the market for PVC pipe was restrained, suppressed, and eliminated throughout the State of New York, and (2) PVC pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce. The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

**COUNT 28: NORTH CAROLINA**
**(On Behalf of Class Members that Purchased PVC Pipe in North Carolina)**

182. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq.* Defendants' conspiracy had the following effects: (1)

price competition in the market for PVC pipe was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) PVC pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' unfair, deceptive, and illegal conduct substantially affected the State of North Carolina commerce. Accordingly, Plaintiff and members of the Class seek all relief available under N.C. GEN. STAT. §75 *et seq*, including treble damages under N.C. GEN. STAT. §75-16.

**COUNT 29: NORTH DAKOTA**
**(On Behalf of Class Members that Purchased PVC Pipe in North Dakota)**

183. Defendants have violated the N.D. CENT. CODE §51-08.1-01 *et seq*. through their anticompetitive actions. Through Defendants' conspiracy, PVC pipe prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for PVC pipe was restrained, suppressed, and eliminated throughout the State of North Dakota. Plaintiff and members of the Class, including those who resided in the State of North Dakota and purchased PVC pipe there, paid supracompetitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota. Accordingly, Plaintiff and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq*.

**COUNT 30: OREGON**
**(On Behalf of Class Members that Purchased PVC Pipe in Oregon)**

184. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Oregon; (2) PVC pipe prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

185. Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725 *et seq*.

**COUNT 31: RHODE ISLAND**
**(On Behalf of Class Members that Purchased PVC Pipe in Rhode Island)**

186. Defendants' conspiracy detrimentally affected the price competition for PVC pipe in the State of Rhode Island by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC pipe prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

187. Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. GEN. LAWS §6-36-7 *et seq*. Accordingly, Plaintiff and Members of the Class seek all relief available under R.I. GEN. LAWS §6-36-7 *et seq*.

**COUNT 32: SOUTH DAKOTA**
**(On Behalf of Class Members that Purchased PVC Pipe in South Dakota)**

188. Through Defendants' actions and the actions of Defendants' co-conspirators, PVC pipe prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for PVC pipe was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiff and members of the Class, including those who

resided in the State of South Dakota and purchased PVC pipe there, paid supracompetitive, artificially inflated prices for PVC pipe.

189. Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq*., through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq*.

**COUNT 33: TENNESSEE**
**(On Behalf of Class Members that Purchased PVC Pipe in Tennessee)**

190. Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq*. Defendants' conspiracy had the following effects: (1) price competition for the sale of PVC pipe, a tangible good, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for PVC pipe, a tangible good, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Accordingly, Plaintiff and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq*.

**COUNT 34: UTAH**
**(On Behalf of Class Members that Purchased PVC Pipe in Utah)**

191. Defendants violated the UTAH CODE ANN. §76-10-3101 *et seq*. by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' conspiracy detrimentally affected the price competition for PVC pipe in the State of Utah by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized PVC pipe prices in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah.

Accordingly, Plaintiff and Members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq*.

**COUNT 35: VERMONT**
**(On Behalf of Class Members that Purchased PVC Pipe in Vermont)**

192. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Vermont; (2) PVC pipe prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiff and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq*.

**COUNT 36: WEST VIRGINIA**
**(On Behalf of Class Members that Purchased PVC Pipe in West Virgina)**

193. Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) PVC pipe prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants have entered into an unlawful agreement in restraint of trade in violation of W. VA. CODE §47-18-1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the

State of West Virginia. Accordingly, Plaintiff and members of the Class seek all forms of relief available under W. VA. CODE §47-18-1 *et seq*.

**COUNT 37: WISCONSIN**
**(On Behalf of Class Members that Purchased PVC Pipe in Wisconsin)**

194. Defendants have entered into an unlawful contract and conspiracy in restraint of trade in violation of WIS. STAT. §133.03(1). Defendants' conspiracy had the following effects: (1) price competition for PVC pipe was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) PVC pipe prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Accordingly, Plaintiff and members of the Class seek all forms of relief available under WIS. STAT. §133.03.

**RELIEF REQUESTED**

Accordingly, Plaintiff demands relief as follows:

(A) That the Court certifies this lawsuit as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), that Plaintiff be designated as Class Representative, that Plaintiff's counsel be appointed as counsel for the Classes, and that the Court directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each and every member of the Class;

(B) That the unlawful conduct alleged in the Complaint be adjudged and decreed to violate §1 of the Sherman Act;

(C) That the Court award Plaintiff and the Classes damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest at the highest legal rate;

(D) That the Court award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(E) That the Court directs such further relief as it may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: September 12, 2024

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*<u>/s/ Brian M. Hogan</u>*
Brian M. Hogan (N.D. Ill. Bar No. 6286419)
Karin E. Garvey (N.D. Ill. Bar No. 2997831)
The Helmsley Building
230 Park Ave., 24th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
brian.hogan@scott-scott.com
kgarvey@scott-scott.com

Patrick J. Coughlin (N.D. Ill. Bar No. 90785466)
Carmen Medici (N.D. Ill. Bar No. 248417)
Daniel J. Brockwell*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com

Patrick McGahan*
Michael Srodoski*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile: 860-537-4432
pmcgahan@scott-scott.com

msrodoski@scott-scott.com

Charles F. Barrett (admitted *pro hac vice*)
**NEAL & HARWELL, PLC**
1201 Demonbreun St.
Suite 1000
Nashville, TN 37203
Telephone: 615-244-1714
cbarrett@nealharwell.com

*Counsel for Plaintiff Blake Wrobbel*

*PHV application forthcoming